IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| NAJI MOHAMMED, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 11-5004 |
| | : | |
| v. | : | |
| | : | |
| JOHN DOE PENNSYLVANIA STATE | : | |
| POLICE SUPERVISORS, *et al.*, | : | |
| | : | |
| Defendants. | : | |


**MEMORANDUM**

**Jones, II, J.**                                        **October 22, 2013**


In his Second Amended Complaint, Plaintiff brought seventeen Counts, alleging *inter alia*, civil rights claims under 42 U.S.C. § 1983 against Pennsylvania State Troopers Michael McKeon, Joseph Yingling, Jason Zachariah, Sgt. Robert Reilly, Major John Laufer, former Captain David Young, and former Commissioner of the Pennsylvania State Police Frank Pawlowski (collectively, "Police Defendants") and Crozer-Chester Medical Center, Nurse Dawn Salvucci, Dr. Kristen Varacalli, and Dr. Hussien Kiliddar (collectively, "Hospital Defendants"). Now before this Court is Police Defendants' Motion for Summary Judgment ("Pol. Defs. Mot. Summ. J.") (Dkt. No. 147), including their Statement of Undisputed Material Facts ("Pol. Defs. SOF") (Dkt. No. 148), Hospital Defendants' Motion for Partial Summary Judgment ("Hosp. Defs. Mot. Summ. J."), including their Statement of Undisputed Material Facts ("Hosp. Defs. SOF") (Dkt. No. 149), as well as Plaintiffs' opposition brief to Police Defendants ("Pls. Pol. Opp.") (Dkt. No. 173) and factual counterstatement ("Pls. Pol. SOF") (Dkt. No. 169), Plaintiffs'

opposition brief to Hospital Defendants ("Pls. Hosp. Opp.") (Dkt. No. 175) and factual counterstatement ("Pls. Hosp. SOF") (Dkt. No. 171), Police Defendants' Reply (Dkt. No. 179), and Hospital Defendants' Reply (Dkt. No. 180). For the reasons set forth below, Defendants' Motions will be GRANTED in part and DENIED in part.

## I.    FACTUAL BACKGROUND

The Court recites the undisputed facts as viewed in the light most favorable to Plaintiff.

### A.  Traffic Stop and Altercation with Troopers McKeon and Yingling

On August 14, 2009, Plaintiff's Decedent, Hakim Jackson was a passenger in a vehicle being operated by non-party, Ashley McDaniel, that was headed southbound on Interstate 95. (Pol. Defs. SOF ¶ 1). Ms. McDaniel testified that on that day, she and Mr. Jackson were in Philadelphia to purchase cocaine. (Deposition of Ashley McDaniel, hereinafter "McDaniel Dep." at 38:1-17). Troopers Michael McKeon and Joseph Yingling effectuated a traffic stop on the vehicle because, according to Trooper Yingling, he recognized the vehicle, it had "heavily tinted windows," and the vehicle committed a "roadways laned for traffic" violation. (Pls. Pol. SOF ¶1; Pol. Defs. SOF ¶ 3, Deposition of Michael Mckeon, hereinafter "McKeon Dep." at 105:17-24). The "dashcam" video of the traffic stop, which begins thirty seconds prior to when Trooper McKeon activated the lights of his cruiser, does not show the vehicle make a traffic violation. (Pls. Pol. SOF ¶4; Video of Traffic Stop). Trooper McKeon testified although he could initially only see the silhouette of the driver, a second figure popped up into view. (McKeon Dep. at 106:22-107:17). Ms. McDaniel testified that at that time, Jackson swallowed cocaine by scooping it out of a plastic bag. (McDaniel Dep., at 36:9-24, 37:1-23, 38:1-24, 39:1-9, 116:12-17.) A subsequent police canine search of the vehicle did not detect any drugs in the vehicle. (Pls. Pol. SOF ¶4).

After the vehicle pulled over and stopped, Trooper McKeon approached the driver's side of the vehicle, while Trooper Yingling approached the passenger side. (Pol. Defs. SOF ¶ 5). Ms. McDaniel exited the vehicle for questioning, while Mr. Jackson remained in the passenger seat. Trooper Yingling testified that Mr. Jackson appeared "nervous." (Pol. Defs. SOF ¶ 6; Deposition of Joseph Yingling, hereinafter "Yingling Dep." at 93:8-14). At that point, Trooper Yingling instructed that Mr. Jackson turn off and exit the vehicle; Mr. Jackson refused and tried to flee. (*Id.* at 93:21-24, 94:1). Trooper Yingling lunged through the passenger side window and Trooper McKeon approached from the driver's side. (Video of Stop; Yingling Dep. at 94:6-7). Trooper Yingling testified that Mr. Jackson repeatedly punched him in the head. (Yingling Dep., at 94:6-10). At that point, Trooper McKeon deployed his Taser, but it failed to stun Mr. Jackson, who then leaped into the back seat of the vehicle. (McKeon Dep., at 118:10-22). Trooper Yingling then deployed his Taser, but it again was not effective. (Yingling Dep., at 51:15-24, 52:16-22, and 94:10-16).

Trooper McKeon temporarily fought off Ms. McDaniel and then opened the back driver's side door and pulled Mr. Jackson out of the vehicle and on to the highway ground. (Video of Stop; McKeon Dep., at 119:1-9). Trooper Yingling came over to assist in subduing Mr. Jackson, but Mr. Jackson was able to flee into the John Heinz Wildlife Reserve. (Video of Stop; Yingling Dep., at 64:2-10). Troopers Yingling and McKeon followed in pursuit of Mr. Jackson, and what happened next remains in dispute. (Video of Stop).

Troopers McKeon and Yingling followed tracks into the brush, ultimately found Mr. Jackson, and subdued him following a brief scuffle in the brush. (Pol Defs. SOF ¶¶ 20-23). Trooper McKeon testified that during this struggle, Mr. Jackson punched McKeon in the face. (McKeon Dep. at 129:15-24, 130:1-5). The Medical Examiner's Autopsy Report documented

blunt force trauma to Mr. Jackson's neck that suggests that he had been choked at some point during the altercation. (Exhibit "F" to Pls. Pol. SOF, Autopsy Report, hereinafter "Autopsy Report" at p.3). Trooper Yingling testified that they finally handcuffed Mr. Jackson after Trooper Yingling deployed his Oleoresin Capsicum ("OC") spray while Mr. Jackson tussled with Trooper McKeon. (McKeon Dep., at 130:6-17)

Trooper Yingling testified that he used his Taser on Mr. Jackson three times: twice at the vehicle and only once in the swamp; however, data downloaded from the Taser shows that he Tasered Mr. Jackson nine times, ranging from durations of one second to nineteen seconds. (Exhibit "E" to Pls. Pol. SOF, Expert Report of Roger Clark ("Clark Report") at p. 3-4.)

Trooper McKeon testified that he did not use his Taser; however, data downloaded from Trooper McKeon's Taser shows that the Taser was deployed one time, for duration of four seconds. (Pls. Pol. SOF ¶¶ 7-19; McKeon Dep. at 158:6-14; Clark Report p. 4).

Troopers James Lark and Erin Jason responded to the scene and located Troopers McKeon and Yingling, as well as Mr. Jackson, who had been handcuffed. (Pol. Def. SOF ¶¶ 29-30). By that time, Mr. Jackson refused to stand. (*Id.* at ¶31). Troopers Lark, Yingling, McKeon, Jason, a bystander, and other police officers pulled Jackson to a nearby dirt road. (*Id.*). Trooper Lark, acting at Trooper Acosta's direction, then took control of Mr. Jackson, who was transported to a waiting ambulance. (*Id.* at ¶32). Although Trooper Acosta had told Trooper Lark to take Mr. Jackson back to barracks, the EMTs on the scene indicated that Mr. Jackson needed to go to the hospital. (*Id.* at ¶¶33-36). Upon finding this out, Trooper Acosta instructed Trooper Lark to go along. Mr. Jackson was then transported by ambulance to Crozer-Chester Medical Center ("CCMC"). (*Id.* at ¶37).

**B. Arrival at CCMC and Subsequent Treatment.**

Mr. Jackson arrived at CCMC at 6:49 p.m. that evening, nearly one hour after the traffic stop. (*Id.* at ¶39). Nurse Thomas McKniff described Mr. Jackson as "very combative," "cursing at staff," "uncooperative," and pulling off his cardiac monitor, pulse ox probe, and IVs at the time of his triage. (Hosp. Defs. SOF ¶ 57; Deposition of Thomas McKniff, hereinafter "McKniff Dep." at 19:6-24, 20:1-6, and 21:19-22). Dr. Elizabeth Barrall, an emergency department attending physician, evaluated Mr. Jackson. (Hosp. Defs. SOF ¶61, Deposition of Dr. Elizabeth Barrall, hereinafter "Barall Dep." at 23:19-24, 24:1-24). Mr. Jackson would not provide her with any medical history, and provided a false name when asked. (Hosp. Defs. SOF ¶¶60,67).

After examining Mr. Jackson, Dr. Barall spoke to an officer who was being treated elsewhere in the emergency department. (*Id.* at ¶63). Based on her examination, it was Dr. Barrall's clinical impression that Mr. Jackson was under the influence of a stimulating intoxicant based on his erratic and combative behavior. (*Id.* at ¶ 67, Barrall Dep., at 31:3-24, 32:1-24, 33:1-5, and 37:1-11). It is disputed whether Dr. Barrall was told at that time by a police officer that Mr. Jackson had ingested cocaine. Dr. Barrall ordered a urine screen of Mr. Jackson, which tested positive for cocaine. (Hosp. Defs. SOF ¶ 69). On her examination, Dr. Barrall also noted that Mr. Jackson had lesions on his back, "presumably from a Taser." (*Id.* at ¶ 68). In light of Mr. Jackson's behavior, Dr. Barall ordered a 0.5 mg dose of Ativan via IV Push, which was administered at 9:28 p.m. (*Id.* at ¶ 70; Barrall Dep., at 45:11-48). According to Dr. Barall's notes from Saturday, August 15, 2009 at 12:32 a.m., Plaintiff was in acute renal failure ("ARF") and had "slight" rhabdomyolysis for which he was receiving aggressive intravenous fluids. (Hosp. Defs. SOF ¶ 72, Exhibit I to Hosp. Defs. SOF, hereinafter "Medical Chart" at CCMC 00031). Within the next half hour, Mr. Jackson had bloody bowel movement and a rectal

examination that was also deemed "bloody." (Hosp. Defs. SOF ¶ 73, Medical Chart, at CCMC 00031).

At that point, Dr. Barrall contacted Dr. Budier and recommended further testing because Mr. Jackson was in ARF. (Hosp. Defs. SOF ¶ 74, Medical Chart, at CCMC 00031). Dr. Budier documented that the subsequent CT scans were "negative." (Hosp. Defs. SOF ¶ 75, Medical Chart, at CCMC 00047-49). At 1:31 a.m., Dr. Barall asked Mr. Jackson if he had taken anything, Mr. Jackson said he ingested 1 ½ grams of cocaine the day before. (Hosp. Defs. SOF ¶ 76, Medical Chart, at CCMC 31). Dr. Barall asked one of the nearby police officers if 1 ½ grams is "a lot" of cocaine; the police officer confirmed that it is. (Hosp. Defs. SOF ¶ 79). Dr. Barrall was concerned that Mr. Jackson could have bowel ischemia, in light of his bloody bowel and other symptoms. (Hosp. Defs. SOF ¶ 80; Barrall Dep., at 55:22-24,56:1-10, and 110:8-113:16; Medical Chart, at CCMC 00031). By 2:42 a.m., Dr. Barrall worried that Mr. Jackson had disseminated intravascular coagulation (DIC) because, in addition to his earlier bloody bowel movement, Mr. Jackson developed bruising to his right shoulder that was not present earlier and hematomas at the Taser sites which were not initially bleeding. (Hosp. Defs. SOF ¶ 84; Medical Chart, at CCMC 00031.)

Dr. Faith Whalen, the ICU intern that worked under the direction of Dr. Hussein Kiliddar, the ICU attending physician, received a patient history from Dr. Barall and saw Mr. Jackson around 2:42 a.m. (Hosp. Defs. SOF ¶ 85). Dr. Neeli, an ICU resident, was also in communication with Dr. Whalen. Subsequent to that, Drs. Whalen, Neeli, and Kiliddar were all in phone contact between 3:00 am and 7:00 a.m. (Hosp. Defs. SOF ¶ 87). Around 4:00 a.m., Dr. Kiliddar discussed Mr. Jackson with Dr. Neeli over the phone. He testified that the conversation was similar to his with Dr. Barrall, that the plan at that time was to trend Mr. Jackson's

rhabdomyolysis and provide IV fluid, and that Dr. Neeli provided him with Mr. Jackson's lab results and noted he was awake in the Emergency Department. (Hosp. Defs. SOF ¶ 89, Deposition of Dr. Hussein Kiliddar, hereinafter "Kiliddar Dep. at 69:17-24, 70:1-24, and 71:1-14).

Dr. Barall spoke with Dr. Hussein Kiliddar around 3:00 a.m. and the two discussed the cocaine use, the lab results, and the worsening rhabdomyolysis. (Hosp. Defs. SOF ¶ 81; Medical Chart, at CCMC 00031). Dr. Kiliddar felt that Mr. Jackson should be admitted to the ICU. (Hosp. Defs. SOF ¶ 82; Kiliddar Dep., at 49:19-24 and 50:1-6.) Based on Mr. Jackson's elevated CK levels, Dr. Kiliddar planned to put Mr. Jackson on a protonix drip, trend his labs, and facilitate Mr. Jackson's eventual dialysis and placement on respirator. (Hosp. Defs. SOF ¶ 83; Kiliddar Dep., at 54:10-24 and 55:1-11). Mr. Jackson was then transported to the MICU 3 on August 15, 2009 at approximately 5:07 a.m. (Hosp. Defs. SOF ¶ 90; Medical Chart, at CCMC 00033.) Dr. Whalen entered a variety of orders with the approval of her attending physician, including one allowing for Fentanyl 25 mcg IV every 4 hours as needed for breakthrough pain and Lorazepam (Ativan) intermittent 1 mg every 4 hours as needed for sedation, as Mr. Jackson was agitated. (Hosp. Defs. SOF ¶ 91; Deposition of Faith Whalen, hereinafter "Whalen Dep." at 38:9-17, 39:2-6, 39:12-24, 42:13-24, 43:1-10; Medical Chart, at CCMC 00183.)

Trooper Zachariah went to CCMC to take custody of Mr. Jackson from 6:00 a.m. until 2:00 p.m. and to relieve Trooper James Sperraza. (Pol. Def. SOF ¶¶ 114-16). Trooper Zachariah received a call from his supervisor that morning telling him that the on-call district judge would be traveling to the hospital to perform a bedside arraignment of Mr. Jackson. (Pol. Def. SOF ¶ 118; Deposition of Jason Zachariah, hereinafter Zachariah Dep. 52:17-24, 53:1-24, 54:1-2). Upon learning this information, Trooper Zachariah informed his supervisor that Mr. Jackson was

not awake.  (Zachariah Dep. at 53:8-12.)  Trooper Zachariah remained on the threshold of Mr. Jackson's room throughout Mr. Jackson's stay.

At or around 6:00 a.m., Mr. Jackson was administered Fentanyl 25 mcg. (Hosp. Def. SOF ¶ 94; Medical Chart, at CCMC 00109).  Dr. Kiliddar arrived at the Hospital around 6:30 a.m.  At about 6:45 a.m., Nurse Dawn Salvucci arrived at the hospital and received an oral report from the night shift nurse regarding Mr. Jackson.   (Deposition of Dawn Salvucci, hereinafter "Salvucci Dep." at 97:3-11).  During a "sign out" meeting at the shift change, Dr. Kiliddar was made aware of Mr. Jackson's condition, including his cocaine ingestion. (Hosp. Def. SOF ¶ ¶ 96-97; Deposition of Kristin Varacalli, hereinafter "Varacalli Dep." at 21:24, 22:1-23, and 23:4-9). Dr. Kiliddar and Dr. Varacalli testified that the diagnoses at the time of the sign-out meeting included acute renal failure, rhabdomyolysis, cocaine ingestion, gastrointestinal bleeding, liver problems, and there was concern that the cocaine was causing Mr. Jackson's rhabdomyolysis. (Hosp. Def. SOF ¶ 100; Varacalli Dep. at 33:4-23 and 34:13-18; Kiliddar Dep., at 239:16-24).

Around 7:40 a.m., Dr. Killidar examined Mr. Jackson, who, much to his surprise, was awake.  (Hosp. Def. SOF ¶ 102).  Dr. Kiliddar asked Mr. Jackson whether he took cocaine, and Mr. Jackson responded  that he did. Kiliddar Dep. at 83:7-14, 115:20-24, 116:1-4).  Dr. Kiliddar discussed with Mr. Jackson his prognosis of kidney damage and the need for dialysis, and his concern about the bloody stools. (Kiliddar Dep. at 83:13-19).  Dr. Kiliddar also explained to Mr. Jackson that he may need to place him on a respirator if his condition changed.  (*Id.*).  Mr. Jackson's condition worsened and he remained combative. (Hosp. Def. SOF ¶ 106).  Around 8:20 a.m., Mr. Jackson was given 1 mg IV of Ativan for agitation. (Medical Chart, at CCMC 109). Around 8:30 a.m., Mr. Jackson was given a dose of Fentanyl.  (*Id.*).  Just prior to 10:00 a.m., Dr. Kevin Sperling performed a nephrology consultation and examined Mr. Jackson in

response to a consult request for acute renal failure. (Deposition of Dr. Kevin Sperling, hereinafter "Sperling Dep." at 10:23-24, 11:1-5, 30:23-24, and 31:1-4). Mr. Jackson was not arousable at this time, and thus Dr. Sperling could not obtain a medical history from Mr. Jackson. (*Id.* at 21:9-11, 22:12-16, 58:8-22; Medical Chart, at CCMC 00055). Nurse Salvucci testified that around 10:00 a.m., she re-assessed Mr. Jackson and found him to be slightly sedated. (Hosp. Def. SOF ¶ 125; Salvucci Dep. at 110:23-24, 111:1-4). Dr. Kiliddar testified that he spoke with Dr. Sperling and communicated that his diagnosis was acute renal failure from rhabdomyolysis. The two discussed the plan for dialysis, along with a recommendation by Dr. Sperling to evaluate Mr. Jackson for compartment syndrome as another potential cause of Mr. Jackson's high CKs. (Kiliddar Dep., at 128:6-24, 129:5-10, 131:1-24, 132:1-24, and 148:2-6).

Trooper Zachariah testified that at some point his supervisor telephoned him to let him know that a judge would be coming to ICU to perform a bedside arraignment. (Pol Def. SOF ¶ 118; Zachariah Dep., at52:17-24, 53:1-24, 54:1-2). Magisterial District Judge Leonard Tenaglia was the judge that appeared at the CCMC ICU to arraign Mr. Jackson. (Pol Def. SOF ¶ 121). Judge Tenaglia introduced himself to Trooper Zachariah, and Trooper Zachariah announced the Judge's presence. (*Id.* at 122; Zachariah Dep., at 56:3-6.). Nurse Salvucci testified that Trooper Zachariah told her that a Judge was on his way to the hospital and asked if Mr. Jackson could be awake. (Salvucci Dep., at 14:1-7). Nurse Salvucci testified that at around 10:30 am Mr. Jackson was still not arousable. (Salvucci Dep., at 113:20-24, 114:1-4).

At some point, Judge Tenaglia began an arraignment process, but stopped part of the way through. Judge Tenaglia could not remember what happened, but believes a nurse went to the side of Mr. Jackson's bed and called for others. (Hosp. Def. SOF ¶ 180; Deposition of Judge

Leonard Tenaglia, hereinafter "Tenaglia Dep." at 29:14-20, 30:1-3). At that point, he stepped out of the room. (*Id.*).

The remaining facts are in dispute. Nurse Salvucci testified that she told Dr. Varacalli that she was concerned that Mr. Jackson was no longer arousable and also relayed the inquiry from Trooper Zachariah regarding whether Mr. Jackson could be awakened. (Salvucci Dep., at 113:20-24, 114:1-4; 14:5-12). Dr. Kiliddar testified that he ordered Narcan and Romazicon at 10:45 a.m. because Mr. Jackson appeared overly sedated, and so that Mr. Jackson was awake for the arraignment. (Kiliddar Dep. at 207:12-20, 216:24, 217:1-2; 208:8-17). Dr. Kiliddar testified that even if an arraignment was not going to occur, Dr. Kiliddar would have still ordered Narcan and Romazicon based on the apparent over- sedation of Mr. Jackson. (Kiliddar Dep., at 193:22-24, 194:1-15, 213:21-24, 214:1-7, 214:8-17, 245:19-24, 246:24, and 247:1-3). Dr. Varacalli testified that the only reason that the Narcan and Romazicon were ordered was to reverse the effects of the Ativan and Fentanyl, and that the goal was to see why Mr. Jackson was so somnolent. (Varacalli Dep., at 131:14-24, 132:1-6). Dr. Kiliddar tried to awaken Mr. Jackson sometime between 10:45 a.m. and 11:15 a.m. by shaking him, yelling, stirring him, and providing painful stimulus. (Kiliddar Dep. at 244:2-24, 245:1-6). After these attempts to awaken Mr. Jackson failed, the doses of Narcan and Romazicon were administered starting at 11:15 a.m. and ending at 11:28 a.m. (Kiliddar Dep., at 245:3-10; Ex. "I", Medical Chart, at CCMC 00118). Dr. Kiliddar was not present during the entire time the stimulants were administered. Mr. Jackson was pronounced dead soon thereafter. A Computed Tomography (CT) scan performed at 2:15 p.m. confirmed that Mr. Jackson had an extensive posterior fossa hemorrhage with edema and a brain stem herniation. (Medical Chart, at 00230).

## II.    **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322. An issue is genuine if the fact finder could reasonably return a verdict in favor of the nonmoving party with respect to that issue. *Anderson*, 477 U.S. at 249.  In reviewing a motion for summary judgment, the court does not make credibility determinations and "must view facts and inferences in the light most favorable to the party opposing the motion."  *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.    **DISCUSSION**[1]

*Count I- Conspiracy to Use Excessive Force*

In Count I of the Second Amended Complaint, Plaintiff alleges that Defendant McKeon and Defendant Yingling "entered into a conspiracy to violate the Decedent's rights guaranteed

---

[1] Neither Police Defendants nor Hospital Defendants moved for Summary Judgment on Counts X, XI, XII, or XVII.  These Counts remain.

him under the U.S. Constitution." (SAC ¶107). Plaintiff's conspiracy claim stands. To prove a conspiracy, a plaintiff must establish: (1) a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for the consequences; (2) the purpose of the plan was to violate the constitutional rights of the plaintiff; and (3) an overt act resulted in the actual deprivation of the plaintiff's constitutional rights. *Kelleher v. City of Reading,* No.CIV.A.01–3386, 2002 WL 1067442, at *7 (E.D. Pa. May 29, 2002). As detailed below, there are genuine issues of material fact regarding whether Defendants used excessive force in detaining Mr. Jackson in violation of his constitutional rights. Furthermore, Defendants have offered testimony opposed to that which was introduced by the Plaintiff, with respect to the number of times Defendants used their tasers. If accepted as true, Plaintiffs version of the facts could prove that Defendants conspired to conceal their purported excessive force after the fact. (Pl. Opp to Pol Def. MSJ 3-6). Such inconsistent testimony and evidence allows this Court to infer that a conspiracy to violate Plaintiff's rights may have occurred, prior to Defendant's alleged use of excessive force. The fact that these alleged uses of excessive force occurred at the same time by the two Defendants acting together, and in light of the Defendant's inconsistent testimony indicating a conspiracy to violate Mr. Jackson's constitutional rights, creates an issue of fact that precludes summary judgment on behalf of Defendants Yingling and McKeon.

*Count II- Conspiracy*

Plaintiff brings another conspiracy charge in Count II of the Second Amended Complaint, alleging that Defendant Trooper Zachariah and the Hospital Defendants conspired to violate the Decedent's constitutional rights. Plaintiff claims that when Trooper Zachariah informed Hospital personnel that the judge was coming to arraign Mr. Jackson, this was somehow a state order to revive the Plaintiff for arraignment purposes. Even accepting

Plaintiff's version of the facts as true, the idea that the Medical Defendants believed that Mr. Jackson had to be awake to be arraigned does not create an issue of fact. Trooper Zachariah simply informed the Medical Defendants that the judge was on his way and inquired as to whether Plaintiff could be aroused.

In addition to the above enumerated factors in a conspiracy, a plaintiff must also show that the offender was acting under the color of law when they deprived the plaintiff of their constitutional right, but the deprivation "does not require that the conspiracy be motivated by invidious discrimination." *Ridgewood Bd. Of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238 (3d Cir. 1999); *see also U.S. v. Price*, 388 U.S. 787 (1966). Furthermore, the plaintiff must show that the plan was known by everyone involved in the alleged deprivation. *Ganci v. Borough of Jenkintown*, No. 95-0262, 1998 U.S. Dist. LEXIS 5097 at *5 (E.D. Pa. 1998); *see also Gerhart v. Commw. Of Pa.*, No. 09-1145, 2009 U.S. Dist. LEXIS 73842 (E.D. Pa. 2009). Although the hospital is not a state actor, as it is privately owned, "a private party who willfully participates in a joint conspiracy with state officials to deprive a person of a constitutional right acts 'under color of state law' for purposes of §1983" and can thus be held liable. *Abbott v. Latshaw*, 164 F.3d 141, 147-8 (3d Cir. 1998); *see also Koehler v. Juniata County Sch. Dist.*, No. 1:07-CV-0117, 2008 U.S. Dist. LEXIS 32079 (2008). However, the Amended Complaint does not present any genuine issue of material fact as to a plan being made by Trooper Zachariah and the hospital to deprive Plaintiff of his constitutional rights when trying to wake him for arraignment. Therefore, summary judgment is granted in favor of Defendants Zachariah and the Hospital on Count II.

*Count III- Unreasonable Force*

Plaintiff brings an unreasonable force charge in Count III of the Second Amended Complaint alleging that Defendant Troopers McKeon and Yingling used excessive force in their search and seizure, which resulted in Decedent's extensive and serious injuries and ultimate death. Plaintiff alleges that the excessive force came in the means of "severe physical beating, including striking, punching, bludgeoning, choking, beating" and "multiple and unnecessary electric shocks by EIDs." (SAC ¶127). Plaintiff maintains that the force and treatment by the troopers was not reasonable or necessary for the circumstance, and therefore unlawful.

When considering the use of force against a person, the court is required to look at the "nature and quality of the intrusion on the individual's Fourth Amendment" rights. *Scott v. Harris*, 550 U.S. 372, 383 (2007). The court should also consider the risk of bodily harm by the police's actions in light of how much danger there was to the public. *Id.* The court has described the test to be used in cases of this nature as one of "objective reasonableness;" the court should compare the intrusion on the individual's right against "'the countervailing governmental interests at stake.'" *Graham v. Connor*, 490 U.S. 386 (1989) (quoting *U.S. v. Place*, 462 U.S. 696, 703 (1983)). Using such an objective standard, there are genuine and materially disputed facts as to whether Troopers McKeon and Yingling used excessive force against Decedent in arresting him in light of the circumstances with the traffic stop and what took place in the woods. Therefore, Count III stands.

*Count IV – Bystander Liability*

Plaintiff brings a bystander liability claim pursuant to 42 U.S.C. §1983 against Defendant Troopers McKeon and Yingling in Count IV of the Second Amended Complaint alleging that both troopers had the opportunity to intervene and prevent any further violation to Mr. Jackson's

rights and failed to do so. Similar to the claim above regarding alleged excessive force used against Decedent, there appears to be a genuine issue of material fact as to whether either of the Troopers could be found liable for failure to intervene as a bystander. The Third Circuit has held that a state officer can be held liable "if the [officer] had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). The "officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* at 61; *see Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir. 1986). In general, officers should take reasonable steps to protect a victim from another officer's excessive force. *Adams v. Officer Eric Selhorst*, 449 Fed. Appx. 198 (3d Cir. 2011); *see also Gleason v. E. Norriton Twp.*, No. 11-6273, 2012 US Dist. LEXIS 102503 (E.D. Pa. 2012). Here, there are material and genuinely disputed facts as to whether 1) there was excessive force used against Decedent; and 2) whether one or both of the troopers had a reasonable opportunity to intervene and prevent a possible violation of Decedent's rights. Likewise, summary judgment is denied for Count IV.

*Count V- Failure to Train*

Plaintiff brings a claim pursuant to 42 U.S.C. §1983 against Defendant State Supervisors for failure to train in Count V of the Second Amended Complaint. Plaintiff alleges that the injuries and untimely death to Decedent were a "direct and proximate result of" the lack of proper training and supervision to the Defendant officers. (SAC ¶144). Furthermore, Plaintiff alleges that the Defendant State Supervisors condoned the actions and were responsible for supervising the officers in a more appropriate manner. Recently, the Supreme Court has stated that an employer's "failure to train its employee in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (quoting *Canton v. Harris*, 489 U.S. 378,

388 (1989)); *see also Gaymon v. Esposito*, No. 11-4170, 2012 WL 1068750 (D.N.J. Mar. 29, 2012). A "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train" to show the supervisors' knowledge of the need for improved or more training. *Id.* at 1360 (quoting *Board of County Comm'rs of Bryan City, Okl. v. Brown*, 520 U.S. 397, 409 (1997)). Courts have also made clear that showing the helpfulness of additional training does not establish liability. *Jewell v. Ridley*, 497 Fed.Appx. 182, 186 (3d Cir. 2012).

More specifically, a supervisor can be held liable for "failing to properly train, discipline or control a subordinate only if the supervisor (1) either knew contemporaneously of the subordinate's offending behavior or knew of a prior pattern of similar incidents or circumstances and (2) acted in a manner than reasonably could be found to communicate a message of approval to the subordinate." *Brown v. Byrd*, No. 00-3118, 2000 U.S. Dist. LEXIS 17354 at *21 (E.D. Pa. 2000). Here, it is not obvious that additional training may be needed with respect to the individual officers' response to fleeing subjects. Furthermore, there is no genuine issue of fact regarding the officers' training. Furthermore, Plaintiff has not demonstrated that the State Supervisors were "deliberately indifferent" to the rights of the Decedent with respect to their policies, or their alleged failure to train on any such policies. Plaintiff fails to demonstrate any additional training that the officers should have received that would have caused the Troopers to act differently. Therefore, summary judgment in favor of the Defendant State Supervisors is granted for Count V.

*Count VI - Civil Conspiracy*

Plaintiff brings a claim for civil conspiracy in Count VI against Defendant Officers McKeon and Yingling. Similar to the above conspiracy claims, Plaintiff alleges that the officers

conspired to use excessive force and interfere with his medical treatment which resulted in Decedent's injuries and untimely death.  Much like a claim for conspiracy under §1983, to prove a claim for civil conspiracy, a "plaintiff must prove: (1) an agreement by two or more persons to perform an unlawful act or perform an otherwise lawful act by unlawful means; (2) an over act accomplished in pursuit of that common purpose; and (3) actual legal damage."  *Haymond v. Haymond*, No. CIV. A. 99-5048, 2001 WL 74630 (E.D.Pa. Jan. 29, 2001); *see also Smith v. Wagner*, 588 A.3d 1308 (Pa. Super. Ct. 1991).  Furthermore, Pennsylvania law also requires "proof of malice, i.e., an intent to injure" to prove a conspiracy.  *Id.*; *see also Miller v. Post Publishing Co.*, 266 Pa. 533 (Pa. Super. Ct. 1920).  The Seconded Amended Complaint and the subsequent facts as viewed in the light most favorable to Plaintiff, indicate that there was a potential "meeting of the minds" between the officers that would preclude summary judgment. Defendant's argument is belied by the inconsistent testimony of the officers in addition to the data culled from their service tasers.  Therefore, summary judgment is denied for the Defendant Officers as to Count VI for civil conspiracy.

*Count VII – Assault and Battery*

Plaintiff brings a claim for assault and battery against Defendant Officers McKeon and Yingling in Count VII.  Plaintiff alleges that the actions of the officers towards the Decedent were "intentional, recklessly indifferent, willful, wanton, malicious, and outrageous." (SAC ¶158).  As the Pennsylvania courts have stated, "a police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty."  *Renk v. City of Pittsburgh*, 537 Pa. 68, 76 (1994).  However, "the reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery."  *Id.*  The officer may be held liable "when a jury determines that the force used in

making an arrest is unnecessary or excessive." *Id.* Furthermore, the officer could be held liable if they unintentionally used too much force. *See also Fullard v. City of Philadelphia*, No. CIV. A. 95-4949, 1996 WL 195388 (E.D. Pa. Apr. 22, 1996); *Ansell v. Ross Tp.*, No. 09-CV-1398, 2012 WL 1038825 at *13-14 (W.D. Pa. Mar. 28, 2012). Despite the argument for sovereign immunity by the defendants, it is unclear that sovereign immunity applies to this claim. Sovereign immunity is only granted when there has been consideration for "whether the Commonwealth employee was acting within the scope of his or her employment, whether the alleged act which causes injury was negligent and damages would be recoverable but for the availability of the immunity defense, and whether the act fits within one of the nine exceptions to sovereign immunity." *La Frankie v. Miklich*, 152 Pa. Cmwlth. 163, 171 (Pa. Commw. Ct. 1992); *see also Mitchell v. Luckenbill*, 680 F.Supp.2d 672 (M.D. Pa. 2010). The question of whether the officer was acting within the scope of his employment "'is ordinarily a question of fact for the jury to decide,'" especially in a matter such as this where there are allegations of assault and battery. *Gerhart v. Pennsylvania,* No. 09-1145, 2009 U.S. Dist. LEXIS 73842 at *38 (E.D. Pa. 2009) (quoting *Strothers v. Nason*, No. 08-1624, 2009 U.S. Dist. LEXIS 30208 at *8 (W.D. Pa. 2009)). Applying the aforementioned reasons here, there is a genuine issue of material fact as to whether the Defendant officers used a reasonable amount of force to prevent further crime by the Decedent. Therefore, summary judgment for the Defendant Officers is denied as to Count VII.[2]

---

[2] For Counts I-VII, Police Defendants assert that they are entitled to qualified immunity and that these claims are barred. The Court has granted the Motions for Summary Judgment in regards to Counts II and V for conspiracy and failure to train respectively and thus, the Court will not address the qualified immunity as to these claims. For Counts I, III, IV, VI, and VII for conspiracy, civil conspiracy, unreasonable force, bystander liability and assault and battery respectively, the Court does not find that the Police Defendants are entitled to qualified immunity. As the Court in *Pearson v. Callahan* describes, the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory constitutional rights of which a reasonable person would have known.'" 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is the Police "[D]efendants' burden to establish that they are entitled to such immunity." *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 726 (3d Cir. 1989). Courts have also specified

*Count VIII- Intentional Infliction of Emotional Distress (IIED)*

Plaintiff brings a claim for Intentional Infliction of Emotional Distress (IIED) against Defendant Troopers McKeon, Yingling, Zachariah, Pawlowski, Laufer, Young and Reilly in Count VIII of the Second Amended Complaint. Plaintiff alleges that the Defendant officers acted in a manner that "was extreme and outrageous and was designed to intentionally or recklessly cause severe emotional distress to Decedent." (SAC ¶161). Pennsylvania courts have "held that when an employee of a Commonwealth agency was acting within the scope of his or her duties, the Commonwealth employee is protected by sovereign immunity from the imposition of liability for intentional tort claims," like the one alleged by Plaintiff. *La Frankie v. Miklich*, 152 Pa. Cmwlth. 163,170 (Pa. Cmwlth. Ct. 1992); *see also McNeal v. City of Easton*, 143 Pa. Cmwlth. 151 (Pa. Cmwlth. Ct. 1991); *Stone v. Felsman*, No. 3:10-CV-0442, 2011 WL 5320738 (M.D. Pa. Nov. 1, 2011). Similar to *La Frankie*, where the "cause of action emanates from intentional tort claims and [the Defendant Troopers are] Commonwealth employee[s], the only question to be resolved to determine if immunity attaches is whether [the Troopers were] acting within the scope of [their] duties as a state trooper" when they arrested Mohammed following the incident on the side of the road. *Id.* at 171; *see also Luck v. Asbury*, No. 3:12-CV-

---

that "government officials are immune from suit in their individual capacities unless, taken in the light most favorable to the party asserting the injury, (1) the facts alleged show the officer's conduct violated a constitutional right and (2) the right was clearly established at the time of the objectionable conduct." *Gerhart v. Pennsylvania*, No. 09-cv-1145, 2009 U.S. Dist. LEXIS 73842, at *11 (E.D.Pa. Aug. 13, 2009). Therefore, taken in the light most favorable to Plaintiff, the facts as viewed in the light most favorable to the Plaintiff demonstrate that the officers' conduct potentially violated a constitutional right during the arrest. Furthermore, Plaintiff's right to be free from unreasonable force and assault and to be reasonably protected by another officer were clearly established laws and the officers should "reasonably be expected to anticipate subsequent legal developments." *Harlow*, 457 U.S. at 818; *see also Grant v. City of Pittsburgh*, 98 F.3d 116 (3d Cir. 1996) ("whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights"). In this conclusion, the Court analyzes the behavior of both Defendant Officers McKeon and Yingling as prescribed by the Court in *Grant* and finds there is a genuine issue of material fact as to their conduct towards Plaintiff. Therefore, qualified immunity will not be granted and the Motions for Summary Judgment as to those counts that are denied.

0887, 2013 WL 433536 (M.D. Pa. Feb. 5, 2013). There is a genuine issue of material fact as to whether the Troopers were acting within the scope of their employment, and intentionally causing emotional distress, when arresting Decedent.   Courts have specified that the tort "involves three elements: '(1) the conduct must be 'extreme and outrageous' (2) the conduct must be 'intentional or reckless,' and (3) the conduct must cause severe emotional distress." *Solomon v. City of Philadelphia*, Civ. A. Nos. 94-2427 to 94-2429, 1996 WL 20651 (E.D.Pa. Jan. 16, 1996); *see also Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307 (M.D.Pa. 1988). Whether Defendants actions arise to that level is a fact issue for a jury to decide.   Therefore, summary judgment for Count VIII is denied.

*Count IX - Negligence*

Plaintiff brings a claim for negligence in Count IX against Defendant State Supervisors alleging that they failed to uphold their "duty of care not to act negligently or recklessly in the training they provide to Pennsylvania Police Officers."  (SAC ¶165).  Pennsylvania courts have extended sovereign immunity to employees of a Commonwealth agency for intentional torts.  *La Frankie v. Miklich*, 152 Pa. Cmwlth. 163, 170 (Pa. Cmwlth. Ct. 1992); *see also McNeal v. City of Easton*, 143 Pa. Cmwlth. 151 (Pa. Cmwlth. Ct. 1991); *Stone v. Felsman*, No. 3:10-CV-0442, 2011 WL 5320738 (M.D. Pa. Nov. 1, 2011).  Because Defendant Supervisors were acting within the scope of their employment while training and supervising the Defendant Troopers and there is no genuine issue of material fact as to how they carried out their duties, sovereign immunity would extend to them.  Thus, summary judgment for Count IX is granted to Defendant State Supervisors.

**<u>Hospital Defendants</u>**

*Count XIII- Vicarious Liability*

Plaintiff brings a claim for vicarious liability in Count XIII against Defendant CCMC. To establish vicarious liability, a plaintiff must show that the constitutional violation was at the fault of a policy or a custom of the establishment and not an employee. *Natale v. Camden Country Correctional Facility*, 318 F.3d 575, 584 (3d Cir. 2003); *see also Monell v. NY City Dept. of Social Srvcs.*, 436 U.S. 658 (1978). Liability can be found "if a plaintiff establishes that the employee's acts reflected the employer's policy or custom." *Wnek v. City of Philadelphia,* No. 05-CV-3065, 2006 U.S. Dist. LEXIS 43999 at *7 (E.D. Pa. 2006). An employer can also be held liable when there is "evidence that [the employer] turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Natalie*, 318 F.3d. at 584. In the case at hand, "a reasonable jury could conclude that the failure to establish a policy to address" situations of this nature during arraignment of patients "creates a risk that is sufficiently obvious as to constitute deliberate indifference." *Id.* As the court in *Wnek* requires, Plaintiff has provided some factual specificity about the allegations in relation to the customs and policies of CCMC. For instance, Plaintiff provides evidence alleging that CCMC failed to properly supervise and implement its "Police Interrogation Policy." (P. Opp. to Hosp. Def. MSJ 13). Plaintiff has demonstrated an issue of fact as to whether the Police Interrogation Policy, or the deficiencies attendant thereto, were the "moving force" behind Mr. Jackson's death. As such, there is a genuine issue of material fact that would preclude summary judgment for the Defendant. Therefore, summary judgment as to Count XIII for vicarious liability is denied.

*Count XIV- Corporate Negligence*

Plaintiff brings a claim for corporate negligence against Defendant CCMC in Count XIV of the Second Amended Complaint. Plaintiff alleges that Defendant CCMC breached its duty of

care and that Decedent's injuries and death were a result of the negligence of Defendant. As described by the court in *Thompson v. Nason Hospital*, "corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital." 537 Pa. 330, 339 (Pa. Super. Ct. 1991); *see also Wheeler v. Prison Health Services,* No. 09-401, 2010 WL 3489405 (E.D.Pa. Sept. 1, 2010). The court goes on to distinguish the four duties of hospitals: "(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients." *Id.* at 339-340 (internal citations omitted); *see also Davis v. Hoffman,* 972 F.Supp. 308 (E.D.Pa. 1997); *Brodowski v. Ryave*, 885 A.2d 1045 (Pa. Super. Ct. 2005). Plaintiff must "show that the hospital had actual or constructive knowledge of the defect or the procedures which created the harm" and that the negligence was "a substantial factor in bringing about the harm to the injured party." *Id.* at 341; *see also Stroud v. Abington Memorial Hosp.*, 546 F.Supp.2d 238 (E.D.Pa. 2008). However, unless the hospital's negligence is obvious, the plaintiff "must present expert testimony to establish a reasonable degree of medical certainty that the defendant's acts deviated from an accepted medical standard, and that such deviation was the proximate cause of the harm suffered." *Welsh v. Bulger*, 548 Pa. 504 (Pa. Super. Ct. 1997); *see also Corrigan v. Methodist Hosp.*, 869 F.Supp. 1208 (E.D.Pa. 1994); *Rauch v. Mike-Mayer*, 783 A.2d 815 (Pa. Super. Ct. 2001); *Brannan v. Lankenau*, 490 Pa. 588 (Pa. Super. Ct. 1980).

In *Thompson v. Nason*, summary judgment in favor of defendants was reversed once the Supreme Court of Pennsylvania found that the hospital did not take the appropriate action in

regards to changes in the patient's health, so there was a sufficient question of material fact. In the present case, Plaintiff has shown a genuine issue of material fact as to whether the hospital was negligent in their treatment of Decedent leading to his death. Therefore, summary judgment as to Count XIV for corporate negligence is denied.

*Count XV- Wrongful Death*

Plaintiff brings a claim for wrongful death against all Defendants in Count XV of the Second Amended Complaint. As expressed by the Superior Court of Pennsylvania, "the purpose of the Wrongful Death Act is 'to compensate certain enumerated relatives of the deceased for the pecuniary loss occasioned to them through deprivation of the part of the earnings of the deceased which they would have received from him had he lived.'" *Berry v. Titus*, 346 Pa.Super. 376, 381 (Pa. Super. Ct. 1985) (quoting *Manning v. Capelli*, 270 Pa. Super. Ct. 207, 2011 (Pa. Super. Ct. 1979)). To receive wrongful death relief, the Plaintiff must show a "pecuniary loss by one in a family relation." *Id.* Under the Pennsylvania statute, family includes spouses, children, or parents of the deceased. 42 Pa. C.S.A. §8301; *see also Rogan v. County of Lawrence, Pa.*, No. 12-1375, 2013 WL 3369146 (W.D. Pa. July 2, 2013). There does not seem to be any precedent with similar circumstances to inform this matter. However, this case is distinguishable from a number of cases in which the municipality is immune from wrongful death claims in suits where the decedents were acting in "utter disregard of [their] safety and the safety of others" when involved in car chases, which ended in their demise due to their own vehicular negligence. *See Tyree v. City of Pittsburgh*, 669 A.2d 487 (Pa. Cmmw. Ct. 1995); *Dickens v. Horner*, 531 Pa. 127 (Pa. Super. Ct. 1992); *Hawks by Hawks v. Livermore*, 157 Pa. Cmwlth. 243 (Pa. Cmmw. Ct. 1993).

Defendant CCMC objects to the punitive damages requested by Plaintiff in the Second Amended Complaint. According to Pennsylvania law, "punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others." 40 P.S. §1303.505(a); *see also Rizzo v. Michener*, 584 A.2d 973 (Pa. Super. Ct. 1990); *Hoffman v. Memorial Osteopathic Hosp.*, 342 Pa. Super. 375 (Pa. Super. Ct. 1985). As discussed in relation to the vicarious liability claim, a jury may find that CCMC was deliberately indifferent as to creating proper policy and custom for situations like that of the Decedent's. There is a genuine issue of material fact under the Wrongful Death Act and therefore, summary judgment for Count XV is denied.

*Count XVI - Survival*

Plaintiff brings a claim for survival against all Defendants in Count XVI of the Second Amended Complaint. According to Pennsylvania Courts, survival actions are a "personal injury action, brought by the decedent's estate in the person of its executor or administrator, which would have been brought by the decedent had he or she lived" and the "damages sought are those for the pain and suffering experienced by the decedent between the time of injury and his or her death." *Prevish v. Northwest Medical Center Oil City Campus*, 692 A.2d 192, 199 (Pa. Super. Ct. 1997); *see also Moyer v. Rubright*, 438 Pa. Super. 154 (Pa. Super. Ct. 1994). Furthermore, "all actions that survive a decedent must be brought by or against the personal representative of the decedent's estate." *Prevish*, 692 A.2d at 200. It appears that Plaintiff is the administrator of Decedent's estate and would therefore be a proper party to bring a survival action.

However, Defendant CCMC raises issues in relation to the request for punitive damages. According to Pennsylvania law, "punitive damages may be awarded for conduct that is the result

of the health care provider's willful or wanton conduct or reckless indifference to the rights of others."  40 P.S. §1303.505(a); *see also Rizzo v. Michener*, 584 A.2d 973 (Pa. Super. Ct. 1990); *Hoffman v. Memorial Osteopathic Hosp.*, 342 Pa. Super. 375 (1985).  As discussed in relation to the vicarious liability claim, a jury may find that CCMC was deliberately indifferent as to creating proper policy and custom for situations like that of the Decedent's.  Thus, there is a genuine issue of material fact and therefore, summary judgment for Count XVI is denied.

## IV. CONCLUSION

For the aforementioned reasons, the Motions to Dismiss submitted by Police Defendants and Medical Defendants are GRANTED in part and DENIED in part.  An appropriate order follows.